Good morning, ladies and gentlemen. I want to announce for the record that Judge Kaney and I are joined this morning by Judge Rovner, who will be on the video. You will see her on the little monitor at the stand, and we can see her right here. So she will be part of our panel today. Our first case for this morning is Arcelor Mittal. So, Mr. Lovell? Thank you, Your Honor. May it please the Court, the court question plaintiffs believe presented in two different contexts by this appeal is what does it and not for resale. To the dissenting justices in the Illinois Brick case, to the Supreme Court of Minnesota in the Lorax case, to lots of scholars, including Judge Posner in the 1970, Richard Posner at that time, in a 1979 article about Illinois Brick, the direct purchaser is a middleman, in the words of that's what Lorax says, too, in Minnesota and other state courts, if we put the whole antitrust claim into the hands of the direct purchaser from the violators. But let me say that, of course, we're familiar with Illinois Brick and that line of cases, and also the fact that some states have Illinois Brick repealers, but Associated General Contractors deals with a somewhat different question. There may be overlap to a certain degree, but it deals more broadly with the directness of an injury, in that case unions, it could be stockholders, it could be employees, it could be others, and the general concept is at some point there's a remoteness factor that enters in above and beyond any indirect purchaser. If you had manufacturer, middleman, middleman, middleman, middleman, middleman, and finally somebody who makes a fabricated good where, let's say, just to the sake of argument, there's only a 5% value added from the original cartelized price, I'm not sure that Illinois Brick and its repealers necessarily mean that that final, final purchaser has standing to sue, or has a claim that's cognizable under the antitrust laws. Well, Your Honor, just to come into that question through this door, the dissent in Illinois Brick and the Illinois Brick repealer states and Lorax all say that the brunt of the injury is borne by the final indirect purchaser, sorry to interrupt, Your Honor, for their own use and not for resale, and that's the economic scholarship, and I think that that does come in. Now you go to the AGC fact pattern, Your Honor, and Lorax's treatment of AGC and the visa cases. I think I'm... Sorry, Your Honor, to start with... What I was gonna say is the dissenting opinions in Illinois Brick are written, as are all judicial opinions, against the backdrop of the fact pattern that the court had before it. And I'll just throw out one thing that I don't know about your particular clients, and that is since the new... I'm gonna get to the new definition of the products involved, but under the new definition of the products involved, you're talking about refrigerators, you're talking about washing machines. I don't know a couple of things about that. I don't know what percentage of those products is accounted for by steel. I don't know to what extent there are substitutes for steel, such as aluminum or other kinds of molded plastic products or the like. I don't know to what extent there's elasticity of supply from foreign suppliers. There are lots of questions that would go to the degree to which you're even injured by the alleged cartel. The degree to which you're injured varies with all those issues you're on. And more. Yeah. In Illinois Brick, the claim was that the... I know what it was in Illinois Brick. I assure you. It's the state of Illinois purchased buildings that had concrete blocks that were price inflated as one component of the building. Here, in the lower... But it was the purchaser of those blocks. It wasn't all the way down. It wasn't people who went to a Starbucks was paying more rent because the building was more expensive because of the cartel. I agree. Here there are three or four steps of distribution for our clients from the... And your clients are fabricating the steel as an input product into a completely different final product. An intermediate actor, Your Honor. The, you know, the building that was purchased was different. In Lorex, the product was... This is the Minnesota law, Your Honor, was a chemical that you treat rubber with when you make rubber. That was actually consumed by the manufacturer there. But because that was price fixed, that increased the cost. It was passed down to three to seven, depending on whether you believed everything that the defendants said. Three to seven... I think Judge Rovner may have a question. Sorry, Your Honor. Excuse me. It's hard for you, I know. I mean, under this theory that you're espousing, is there any de minimis amount of steel that would be too insufficient to trigger standing? I mean, how about a product where 99% of its steel ultimately came from a non-defendant supplier and just a few steel screws came from a defendant supplier? Well, yes, Your Honor. Sorry, go ahead, Your Honor. Well, we've tried to pick the products that have the most steel in them, automobiles. We allege that the demand for the product of the steel companies is solely from downstream, and that we allege that these price increases to the auto manufacturers are priced on, or passed on, pardon me, and we quote their... Well, of course, they're only passed on to the extent that they permit that. Maybe we should just jump right to the point that actually concerns me the most about your case, because I will grant you that the district court did not look state by state to see which states' indirect purchase or repeal statutes may have allowed your case to go forward and which did not. The other thing the district judge was concerned about was the sea change in the definition of steel products between your original complaint, which were the products manufactured by the defendants, steel sheet, coil, galvanized sheet, etc., etc., and the 2015 definition of consumer steel products, washing machines, all the rest of that, clothes dryers, ovens, air conditioner units, barbecue grills, and so forth. I think that that is a very, very significant change, and one which the judge may not at all have abused his discretion to say this is a completely new lawsuit, and thus one that's late. Yeah, we do think... And might I just add, I have the very same question, and if, in fact, the products that are described in the first complaint and the amended complaint are the same, then why in the world would the named plaintiff decide to change the alleged product for which he ever paid from steel tubing to trucks? Okay, Your Honor. Now, on the definition, which we the complaint and the brief, but... But the question is whether this change is something that so changed the lawsuit that it needs to be regarded anew for the statute of limitations. And the answer to that question is found in the original definition of the complaint, whether it encompassed washing machines, refrigerators, and the other products. And I can't see how in the world it did. Well, my washing machine doesn't look like a steel bar. But, Your Honor, that's the thing about the English language. The defendants say, Your Honors, that we copied our definitions from the direct purchaser. From the direct purchaser. But I don't care who you copied it from. It's just a different definition. No, but can I just, Your Honor, can I just respond on this, please? The direct purchasers had in their definition of steel products made by the defendants, and all other products made by the defendants. We didn't say that. At the end of paragraph three on steel products, Your Honor, we said, and a variety of other products derived from raw steel. And we cited in our reply brief to Justice Scalia's book on interpretation that where you say, and we put in include, but not limited to, and a variety of other products, that if we had just said include, that includes not, if it's Judge Scalia's example in his book, Justice Scalia's example in the book was, if you say it includes, a group includes 300 lawyers, that means it includes 300 lawyers and as many people as possible from other walks of life. No, it doesn't mean, Justice Scalia, not to say this is the be all and the end all, but Justice Scalia would never have said, if you have a group that includes 300 lawyers, it also includes the entire population of India. I mean, it, there could be 300 lawyers in there. They have a lot of lawyers in that makes it meaningless. There are other canons of construction that are equally respectable, that suggest when you have a list, the items in the list are known by their neighbors, to avoid the Latin, and it's all other products when you say it in the first definition that you used, your original complaint, where you said, and a variety of other products derived from raw steel, that means it's been fabricated to the point of being a flat sheet, a coil, a beam, a rail. Raw steel is, is, is molded into a number of shapes before it then goes on to be fabricated downstream. Your Honor, Your Honor, we, I, I, well, we. And, you know, this variety of other products, what, you know, if I have a pen that has, like, a little steel clip on it, does that mean it's in your product definition? Your Honor, the, yes, it does mean that, I think. Your Honor, you asked many questions. If I could just go back to the core, to the core question, the meaning of this, and, and if that's okay, if, the, the answer is that we said that we are indirect purchasers of, and for end use, and not for resale of these steel products. And, and we said that at paragraph 26. That's the class definition. And at paragraph 31, we described the effects on auto manufacturers, appliance manufacturers, and others. And at paragraph 23, we said. Of your amended complaint. No, no, no, no. Of our original complaint. Sorry, Your Honor, to laugh, but I, I, in the original complaint, the definition we gave is from paragraph 3 to paragraph 26 to paragraph 31 to paragraph 23, it's not all in one place. I apologize. But what that says is, I'll just read paragraph. So you think the defendant should have been on notice from your original complaint that every single product in the United States that's manufactured with steel as any amount of a component was what you intended to be suing about? Your Honor, paragraph, yes. I'm asking that. Yes, but not every, but not every single product, Your Honor. You can't draw the line. If you're going to say that, I don't see where you can draw that line. The defendants themselves said when they moved to dismiss the complaint and in interpreting the complaint, the plaintiff's suit encompasses any consumer steel product from refrigerators to washing machines to other consumer products. It's more akin to a case for pizza from cheese. And that is what these four paragraphs together say, Your Honor. And if I could just read 23 briefly. And you think that Minnesota would allow that kind of completely unlimited case? Yes. If it's an indirect purchaser case through 3 to 7 levels, the highest 3 to 7 levels of pass on, Your Honor, the highest court said, that doesn't trouble us at all. What the court said was the visa type of case where you have somebody, anybody can sue the retailer, but they're not getting the credit card service. Well, that's why I come back to the change. I mean, you are looking at just Rule 15c. But there is also, this was not an amendment as a matter of course. This was an amendment that you wanted to make with the permission of the court, I think. Correct me if I'm wrong. We, well, the motion to dismiss was filed and we did a stipulation to do it. The complaint had not been previously amended, Your Honor. But it wasn't within 21, I'm looking at Rule 15a. No, no, you're right, Your Honor. It was, there was permission, there was a stipulation and permission from the court to do so. Right. And so that's what takes me to the aspect of Rule 15 that leads me in the direction of thinking that there is some discretion here and that it's not. It's not purely de novo review because if it's not an amendment as a matter of course under 15a1, then what the rule says is in all other cases a party can amend only with written consent or the court's leave. The court should freely give leave when justice so requires. That phrase justice so requires connotes discretion to me. Your Honor, I understand. I think that bridge was crossed and I think the key issue in the judge's opinion here was what does the complaint mean, the original complaint? What's in the new complaint? Does what's in the new complaint arise out of the transactions, occurrences, or conduct set forth or attempted to be set forth in the original complaint? And paragraph 23 says the plaintiff class is being squeezed by the steel mill's market domination and shortage of supply in which indirect consumers of steel products, the people who consume them ultimately, paid substantially more for the steel products during the conspiracy period than they would have paid in a truly competitive market environment. That's right out of the Supreme Court dissenting opinion that it's passed down and we paid super competitive prices. I'd say both issues arise from this. What does it mean to be an indirect purchaser? We say paragraph 3 covers this, but if paragraph 3 stops at some point, Your Honor, we still are the indirect consumers of the steel products and we alleged how this effect went down the chain. And I believe I didn't answer the question about the interrogatory. Your Honor, where have you demonstrated a direct link between the defendant's steel mills and an end product? I couldn't see that. Your Honor, in the broiler chicken case, which was decided recently, the court... No, no, you, not the broiler chicken case. Where did you do it? Well, we have alleged facts consistent with the broiler chicken case, Your Honor. In the broiler chicken case, the court said that for federal AGC purposes, if you allege 88% of the products come from the defendants, you've said enough to have standing and causation, tracing in effect. And here we say that 80 to 85% come from them. You didn't identify where the steel came from. You didn't identify how much of the steel product came from the defendant's steel mills. You did not identify any product the plaintiffs bought or even how much of any particular product came from defendant's steel. I mean, these are very conclusory causal connections, and I don't see how they would ever suffice under Iqbal and Twombly. I just can't see it. And if you can help me, that'd be great. Well, Your Honor, our facts are that, number one, these defendants have 80 to 85% of the market. Number two, they restricted the supply. And we go on for 70 or 80 paragraphs to show the magnitude of these meetings and restrictions. Then we allege what happened at paragraphs in the amended complaint you're really talking about now, Your Honor. Paragraphs 153 to 161, we go through these intermediary purchasers of steel. But you don't show any Minnesota. You don't have any person from Minnesota, for example. Do we know that anyone in Minnesota was injured by this at all? Well, Your Honor, it's going to cover Minnesota. The end of the answer is going to cover Minnesota. We have class standing, the court held below, Your Honor. We don't have a named plaintiff, but we have class standing to sue for these states. And under Seventh Circuit law and under the court's decision below, we don't have to have the plaintiff. Now, it's a matter for class certification. But we do have plaintiffs for many states. But the answer to Your Honor's question on how do we show it is that the class hasn't been certified. No, but that's when it comes up whether we'll have a representative from Minnesota or whether we need to. You might want to save just a minute for rebuttal. Did I go by my time, Your Honor? You're into your rebuttal time. Okay. I just want to say, Your Honor, that the effect of all this conduct is alleged that the auto manufacturers had to get higher prices and had to try to pass it on. And we quote many appliance manufacturers who did say that they passed on the prices due to the increase in the price of steel. And the defendants had 80 to 85 percent of steel and restricted the supply. And they said they had shortages. So it's a reasonable inference at that point, Your Honor, that the consumers paid the higher prices. That's how we try to do it. Sorry to go over. All right. Thank you. You will have a minute or so for rebuttal. Mr. Scodro. Thank you. And may it please the court, counsel. There are two independent grounds on which this court can affirm the judgment below. And with the court's permission, I would like to begin with the limitations period that devoted most of the previous argument. There are several points to make here, Your Honor. The first is that a direct purchaser complaint had been filed 12 days earlier. And I recognize Your Honor's point that it needn't matter where the language came from. But for purposes of context, the direct purchaser complaint had been filed 12 days later. This complaint is filed that is largely verbatim with the direct purchaser complaint, including, for the most part, the definition of the steel products. Now, Mr. Lovell says, though, that beyond the definition, you did get notice from that first indirect purchaser complaint that the downstream market was in play. And, Your Honor, we respectfully disagree with Mr. Lovell's point. Paragraph 23 speaks of indirect purchasers, but this is an indirect purchaser complaint. And so what the complaint has done is said that to the extent that individuals have purchased coil and sheet and other products from the mills, mill output, as referred in the briefs, to the extent those are being purchased indirectly, then, indeed, they are representing the indirect purchasers. Now, is there a market or are there intermediaries who purchase mill output and then resell to others? Sure, Your Honor. In fact, the $171 worth of steel tubing that the plaintiff here, the original plaintiff, Supreme Auto, purchased in response to an interrogatory said, yes, I purchased this and gives the name of the retailer from which he purchased or the entity from which he purchased that steel tubing. The case proceeds, and I should add, he's referring to paragraphs 30 and 31 in addition to paragraph 23. 30 and 31, if anything, reinforce the notion that they're talking about mill output when they're talking about what their indirect purchasers are buying. 30 talks about raw steel and what it can be made into, and then 31 talks about steel products, the defined term that the indirect purchasers have bought, talks about steel products being used in a multitude of manufacturing industries, talking about auto and train and ship. This only makes sense. This, too, is taken from the direct purchaser complaint, and it only makes sense if we're talking about indirect purchasers of mill output. So when, according to you, did you first become aware that the plaintiffs were expanding beyond mill output to final consumer products? Is it when the depositions were sought or the discovery? Sure. Your Honor, so to provide a bit of context and to answer, the short answer is it started in December of 2015. The context for that is starting with an order from the court in late 2009, and this is Dock 76 in the docket sheet below, and that was granting an agreed motion, which is Dock 67. The court's order permitted discovery to proceed in our indirect case, basically mirroring what was happening in the direct case. The plaintiffs were permitted access and so forth to what was being exchanged. Again, on all fours with the notion that these two were essentially in tandem with the exception of the fact that these were indirect purchasers of mill output. The agreed order permitted the plaintiffs to seek additional discovery to the extent that it would depart from the direct purchaser discovery. That didn't happen until we get to December of 2015. So now we're nearly 11 years after the start of the class period, which is January 1, 2005, and we're more than seven years after the original complaint was filed. Longest limitations period for any of the states for any of the claims is six. So at that point, we're now seven plus years later, they start issuing third-party subpoenas to the likes of Whirlpool, Lowe's, Home Depot, seeking information about the purchase and sale of a variety of steel products. At this point, the defendants are for the first time on notice that the plaintiffs have construed their definition of products to include something not just beyond mill output, but indeed something that substitutes for mill output. So is it your theory that in any indirect purchaser suit, you have to be talking about the exact product that the direct, that the alleged cartelist or the alleged monopolist has created, so mill output here, and that intermediate products down the line somehow break that chain? Well, Your Honor, we have a separate argument, and there's a separate basis for the judgment below that this is too attenuated, and I'm very happy to discuss where we would draw that line as well, Your Honor. Well, they're related in the sense that if that's not your, well, if your theory is just the pure, look, it's, they sent an ingot out, and somebody else put it in a warehouse, and somebody else sought it, and it's all that same ingot, then fine, I understand that. And it's very easy to see that the change in definition would be a very material change, but also very easy to see, you know, why that's a rather narrow view of indirect, even indirect purchaser suits. Because there are a lot of states that have these laws. because they have virtually the same product class, and the attached complaint defines steel products in no uncertain terms to be materials sold by the defendants. So these are the events that are transpiring. Everyone is on the same page that we're talking about mill output being resold to indirect purchasers. There is an additional layer here, and this goes to Your Honor's point about the abuse of discretion. Judge Shaw was well aware of the prejudice that's at issue. This is not an academic distinction between one very narrow product universe and an entirely new, it's not even an expansion, entirely new product universe of end-use consumer products. Everything from, indeed, this pen, to a toaster, to a bicycle, to a washing machine and a toaster, and there was no notice until December of 2015 that this was going to be in play. Well, what happens when you shift to that sort of product universe? All of a sudden, the information held exclusively by those interim manufacturers, distributors, retailers, and so on, becomes the showcase of what goes forward. What are they, how much are they paying? Well, that's my concern, how much steel winds up in those products, where did that steel come from? Absolutely, and Judge Shaw recognized, and he says this both in his original opinion and his opinion on denial of reconsideration, that we are, at this point now, we're asking non-parties whom we don't control for specific data that is now 11 years old, that we would need to defend against claims that all of these alleged price increases are being passed through. Those would become the showcase of summary judgment and trial and so forth, and now all of that data is in the hands of third parties and it's a decade plus old. And so that prejudice, that finding of prejudice, is more than sufficient, frankly on a de novo standard, but quite easily on an abuse of discretion standard. Now turning to your Honor's question, unless the Court has further questions about the limitations period, I'll address your Honor's question regarding the other basis for the District Court's decision in this case. Are we going to call that the Associated General Contractors? We can, or the Proximate Cause, either one, your Honor. With regard to Proximate Cause, which is the term we use mostly in our brief, there's no dispute in the case, and this is now clear from the reply brief as well, that every state, including Minnesota, which we agree, by the way, is not before the Court now, because we're moving merely to dismiss 16 plaintiffs, their complaint, and none of the 16. I mean, if the class were certified, I think it would be under Payton against County of Kane and other similar cases. And Morrison, correct, absolutely. But in the absence of that, we're just proceeding with, you know, we're moving to dismiss 16 plaintiffs, and none of them have any alleged connection whatsoever to Minnesota. But even putting that to one side. But isn't it troublesome that the District Court didn't take the time to look at the law of each of these states, because it seems clear to me that some of them have a more aggressive view, let's say, about indirect purchase or suits and think that that's the best way to recompense their consumers. Sure. Well, two or three quick points on that, Your Honor. The District Court did have voluminous appendices from both parties that were attached to the motion to dismiss briefing. And the Court, pages 7, 8 of the Court's opinion, the Court does walk through. To be sure, the Court collects some into what he believes to be doctrinal buckets, but he does walk through each and every jurisdiction, including those that aren't necessarily before the Court, although he treats them separately, first treating the ones that represent the nine plaintiff repealer states. So I think the Court here clearly did look at these and does treat each of these states, albeit at times he collects them together again into sort of doctrinal groups. The second point I would make is if we just look at Lorax. Lorax is sort of the one case that has been talked about. Again, it's not a case this Court needs to grapple with, frankly, given the nature of the plaintiffs here. But let's take a quick look at Lorax. Lorax makes clear on its face that proximate cause is required. It says as much. Lorax further makes clear that remoteness is an issue that all Minnesota courts must consider in deciding whether there's standing or proximate cause for purposes of state antitrust claims. Now, can you think of any other case in the Illinois brick line where somebody has said, in one of the repealer states, which you have to be, of course, in one of the repealer states where somebody has said, I can see that you're an indirect purchaser, but this is too much for want of a nail. The kingdom was lost. You're just too far out down the line, and so we're going to cut you off for proximate cause reasons, even though we can see that there was some chain of transactions that brought this down to you. So there are a number of indirect. I mean, there are certainly cases that we have cited in our brief, like Southard, which is a case in Iowa. That's a Visa MasterCard case. That's like a genre, right, the Visa MasterCard ones. They are, although in many, many ways, including, I would say, most economically relevant ways, the connection is far tighter, frankly, this number of steps between the financial overcharge alleged there and what consumers were paying. And I should add that Lorax itself distinguishes the Visa card cases, not to say they were incorrectly decided, but to warn that any case that results in every Minnesotan being a potential plaintiff is probably a bridge too far. And those words, I think, bear strongly on this case. It's very hard to imagine that that court who said those words would uphold this complaint in this case. Warning. Well, your theory has to be that if it's all consumer products, consumer steel products, or actually, yeah, consumer steel products for end use, that it would be hard to find a Minnesotan that didn't have at least one. Yeah, under that definition. I think they have defined the class in a manner that runs afoul of what several federal courts and Lorax itself have warned against, which is enlisting every consumer as a potential antitrust plaintiff. As Judge Dow said in the dairy farmers case, if you see that, it's not direct evidence that you have violated proximate cause, but it's very strong evidence that you violated proximate cause. So are we certain that it's the state rules of proximate cause that apply here and that there's no federal court dimension? In other words, if you're pursuing this case in a federal court, obviously if we were talking about Article III standing, which I believe we are not, but if we were, then it wouldn't matter to us whether the state court was willing to entertain the case because the federal court has to apply Article III anyway. So is there anything of that sort? Well, Iqbal and Twombly are being applied here, and that's something that I think can be forgotten. Even though we're talking about the state law claims, the admonition from those decisions, we're talking about Rule 8 pleading in a federal court. I do parenthetically want to add to my answer to Your Honor's earlier question. I believe in the California electric wholesale cases, those you really were talking about a single chain of distribution, and the court's finding too much remoteness. Too many steps, yeah. So I do mean to add that. I believe the court in that case found it was too attenuated. I know for certain the court applied AGC in those cases, and I believe that was the outcome. Okay. But returning to the merits issue or the proximate cause issue, they don't offer us, at the end of the day, they don't offer anything other than the following. This is the rule, as close to a rule as they come, which is to say they want the court to announce a rule that if you are an indirect purchaser, as they define it, anywhere in the chain, that's all you need to say in order to plead proximate cause. Even though, and there are at least six deficiencies that are present here, even though in the combination of these six it's okay because they've said they're indirect purchasers. They haven't told us which products they've purchased, much less at what percentage, and we hear from counsel that an acknowledgment, as they must, that the percentage matters. It's going to determine the level of harm. The product in this case is transformed dramatically as it moved through a very, very lengthy distribution chain that includes reshaping and creating essentially new products as it moves down the line. We end up in a very different market. I don't think anyone would contend that the market for sheet steel is the same as the market for pens or toasters, and a number of district court cases, including, again, in Reed Dairy, the DRAM case, have treated changes of that nature as different markets. You end up with every consumer in the country being a potential plaintiff based on the breadth of the definition. So can I ask you about your idea is that they need to show that it was one of the defendants who supplied the steel, as I understand it, one of the defendants who supplied the steel that is then later fabricated down the chain. Steel, in some ways, is a commodity. It's manufactured to different specifications and the like, and we've seen this problem before where maybe 85% of the market is covered by defendants and the other 15% isn't and there are various theories of market share liability and others. Why do we need to trace exactly which defendant, if the defendants have created a cartel price, everybody else is going to price comfortably just under that cartel umbrella anyway? Why does it matter? Sure. So it's the way they've, in part, the answer is as simple as it's the way they've pled the case. In paragraph 39 of their current complaint, this is the amended complaint, they define plaintiffs in the class as plaintiffs in the class have purchased steel products that contain steel manufactured by defendants. So in essence, that's what they have limited themselves to. They have not pled an umbrella theory. The second point I would make, and this goes to the 80% to 85% number that was used on a handful of occasions in the opening argument, yes, both the original and the amended complaint include the reference to 80% to 85% of raw steel capacity, and that again is borrowed from the original direct purchaser complaint filed back in September of 2008. That's about raw steel output. The relevant figure in our view and the one that we include in our brief is the amount of steel that is consumed domestically, how much of it comes from U.S. producers, not just these defendants, but all U.S. producers. And what those statistics suggest is that between a third and a quarter of steel consumed domestically comes from the brothel. There's a very long history of that with anti-dumping and countervailing duties, etc. Yes, there is a lot of foreign capacity. Right, exactly, and that we think very much they would have to weed all of that out, and as courts have held, merely alleging in a conclusory fashion we will figure out how to trace is inadequate. The Los Gatos Mercantile case said exactly that, that that is simply an inappropriate way of pleading in our Twombly and Iqbal era. Finally, the plaintiffs refer to the fact that they make allegations in their complaint in paragraphs 150s, 160s, referring to public filings by various intermediaries suggesting that the price is in fact passed down the chain. As we point out in our brief, as many of those quotes actually show the contrary. You have a number of intermediaries truthfully relating to their investors and to the marketplace that they may not be able to pass on the amount of any overcharge in any of the raw materials that they use to make their products. They may not even care. If the steel is only 5% of the value added of the product, it might be something they could absorb. Correct. And depending on the elasticities of demand, whether that's even feasible, and that's something that many of them quite candidly submit in those very filings that are quoted in the complaint. So you have on the one hand a very conclusory and inadequate statement that we'll figure out how to trace. At the same time, you have statements by the intermediary saying we actually may not be able to pass any overcharges that they receive on. For each of these reasons, we would ask this court to affirm. Twombly instructs that deficiencies in complaints should be exposed at the time of the minimum expenditure, time and money by the parties in the court. That time is now. We are many, many years into this. And for either or both of the grounds relied upon by the district court, we would ask that this court affirm. All right. Thank you. I'm sure you have a few final words, Mr. Lovell, so the podium is yours. Thank you, Your Honor. I want to address the defendant's statement in their brief, their brief to dismiss, and what they cited to then and what they said. They said plaintiff's suit encompasses any consumer steel product. Complaint paragraph three, they tied this, and they went on and they said, from refrigerators to washing machines to other consumer products. Defendants didn't say anything about discovery. They cited solely to the complaint. It was a motion directed to the complaint. And in discovery, Your Honor, if they thought that we had gone nine miles and we were exposing them to liability, they would have objected. And they would have said, you can't expose us to all this liability when you didn't plead originally. Instead, they participated in the Esenmacher affidavit, Your Honor, it's in the record. They participated in all the discovery conferences. They set everything up for us to do that. It's my understanding that it was not until the December 2015 inquiries to Whirlpool and the others that the plaintiffs were actively pursuing discovery against these end-user products. Well, Your Honor, we did seek discovery from the defendants at the outset. No, but from Whirlpool. Yes, Your Honor. It wasn't until December 2015 that you were going after those kinds of companies. I think that's right, Your Honor. That's what was represented in the briefs. I think that's right. I'm not disputing that. But I do want to say we sought from the team. So why they should have known before that when you yourself were just asking for the 150-some-odd dollars or whatever it was for the tube, how would they know? Your Honor, we asked them for all their customers, and in the discovery we did, we asked them for all their discoveries, number one. But number two, if you go back to their own statement about paragraph three, they can't dismiss the complaint based on discovery. They can only dismiss the complaint based on what's in the complaint. They cited to this paragraph three, which the plaintiffs say, you know the way we interpret it, Your Honor, it's one way to have notice here. The other is that the later complaint arises out of we think if you take paragraph three and their interpretation of paragraph three that they cite to in their own admission, plus the indirect purchaser of the products, plus the indirect consumers who are squeezed by this, plus the allegations in the original complaint, paragraph 31, of how this is passed on to them, the basis for their admission here and the basis for why they did that is the original complaint. Okay. I think you need to wrap up now. Just to conclude, the reason I just wanted to say, the reason we switched, we say that the stuff that's in the complaint now was always included, but we acknowledged to try to limit it. All these products of steel tube are not the products where most of the steel went. The defendants from discovery, we knew most of it went into these other products. Thank you, Your Honor. Okay. Thank you very much. Thanks to both counsel. We'll take the case under advisement.